UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SOPHIA EGGLESTON

　　　　　　　　　　　Plaintiffs,

　　　v.　　　　　　　　　　　　　　　　Case No. 15-11893
　　　　　　　　　　　　　　　　　　　　HON. TERRENCE G. BERG
LEE DANIELS, et al.　　　　　　　　　　HON. ELIZABETH A. STAFFORD

　　　　　　　　　　　Defendants.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (DKT. 46)
AND DENYING WITHOUT PREJUDICE
DEFENDANTS DANIELS, SPELLMAN, AND STRONG'S MOTION TO
DISMISS FOR LACK OF PERSONAL JURISDICTION (DKT. 48)**

　　　In this copyright infringement case, Plaintiff Sophia Eggleston ("Plaintiff" or "Eggleston") alleges that her self-characterization in her 2009 memoir *The Hidden Hand* was the uncredited inspiration for the character Loretha "Cookie" Lyon on the FOX television series *Empire*. (Dkt. 1, ¶¶ 73-80.) Two motions are before the Court. First, all Defendants seek to dismiss Plaintiff's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. (Dkt. 46.) Second, Defendants Lee Daniels, Malcolm Spellman, and Daniel Strong (the "Individual Defendants") assert, pursuant to Federal Rule of Civil Procedure 12(b)(2), that this Court lacks personal jurisdiction over them. (Dkt. 48.) The motions are fully briefed, but Defendants have filed objections to several declarations Plaintiff submitted as exhibits to her response briefs. (Dkt. 56.) Plaintiff has responded to Defendants' objections. (Dkt. 57.)

On May 18, 2016, a hearing was held on these motions in Detroit, Michigan. (*See* Dkt. 58.) For the reasons stated below, Defendants' motion to dismiss will be **GRANTED IN PART** as to Count II only and **DENIED** as to the remaining Counts. The Individual Defendants' motion to dismiss for lack of personal jurisdiction (Dkt. 48) will be **DENIED WITHOUT PREJUDICE**. The Court will order the parties to conduct **THIRTY DAYS** of jurisdictional discovery. The Individual Defendants may re-file their motion to dismiss for lack of personal jurisdiction once this jurisdictional discovery is complete.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On May 27, 2015, Plaintiff filed a pro se complaint alleging that the television series *Empire*, and in particular the character Loretha "Cookie" Lyon ("Cookie Lyon"), was inspired by Plaintiff's 2009 memoir *The Hidden Hand*. (*See* Dkt. 1.) A copy of the memoir was attached to the complaint. (*Id.*) After Plaintiff retained an attorney, she filed her First Amended Complaint on November 20, 2015, and again attached a copy of *The Hidden Hand*. (Dkt. 43.) The First Amended Complaint contains two counts: copyright infringement in violation of 17 U.S.C. § 101 et seq. (Count I), and the unlawful appropriation of Plaintiff's right to publicity in violation of Michigan common law (Count II). (*Id.* at ¶¶ 75-96.)

### A. Plaintiff's Memoir *The Hidden Hand*

In 2009, Plaintiff self-published her memoir entitled *The Hidden Hand*. (*Id.* at ¶¶ 31-32.) Composed between 2005 and 2007, with additional material added in 2009, *The Hidden Hand* details Plaintiff's "life of crime, her time in prison, and her

2

subsequent redemption." (*Id.* at ¶ 35.) The title is a reference to the hidden hand of God that Plaintiff believes has been guiding and protecting her throughout her tumultuous life. (Dkt. 43-1, p. 5-7.) Plaintiff registered her memoir with the copyright office on or about November 16, 2009, and received copyright registration number TXu001656874. (Dkt. 43, ¶¶ 33-34.)

*The Hidden Hand*, set primarily in Detroit, is a thorough retelling of Plaintiff's life beginning with her birth in 1966 and her earliest memories. (Dkt. 43-1, p. 20.) Plaintiff describes herself as a person who was born "ready to fight" and who suffered an abusive father throughout her childhood. (*Id.* at 20-23.) By the age of eight, Plaintiff asserts that she was leading her first gang and had developed an uncontrollable temper. (*Id.* at 27-28.) At fifteen, Plaintiff started selling drugs and moved into the home of Robert Lucas, with whom she began a romantic relationship. (Dkt. 43-2, pp. 3-11.) Plaintiff became addicted to drugs, and struggled with that addiction throughout her adult life. (*See, e.g,* dkt. 43-9, pp. 25-30.) She recounts how she committed crimes, was convicted of several offenses, and went to jail, but was eventually able to maintain her sobriety after serving her second prison term. (Dkt. 43-2, pp. 10, 32-45; Dkt. 43-3, pp. 9-10.)

Many significant events in Plaintiff's life are detailed in *The Hidden Hand*. Plaintiff recounts the attempted kidnapping of her youngest daughter (Dkt 43-10, pp. 44-46), and coming to terms with her brother's homosexuality, which he revealed to her while she was in prison (Dkt. 43-9, pp. 3-4). Plaintiff survived numerous incidents where she was threatened with guns. (Dkt. 43-8, p. 2; Dkt. 43-

3

11, pp. 12-13; Dkt. 43-12, pp. 4-6, 21.) The memoir also includes stories about Plaintiff's two sisters, both of whom were murdered. (Dkt. 43-4, pp. 19-31; Dkt. 43-5, pp. 26-43.)

After her first sister's passing, Plaintiff met Eddie Hodge at a Johnnie Taylor show. (Dkt. 43-4, p. 37.) Eddie and Plaintiff became romantically involved, and it is through Eddie's contacts in the music business that Plaintiff met many famous musicians, including Taylor, B.B. King, and George Clinton. (Dkt. 43-4, pp. 37-50; Dkt. 43-5, pp. 1-2.) Plaintiff and Eddie eventually had a daughter. (Dkt. 43-5, p. 3.) The couple would separate and reconcile several times throughout Plaintiff's life until Eddie's death from cancer. (Dkt. 43-11, pp. 38-46.)

Prior to Eddie's death, Plaintiff had a romantic relationship with Rodney Meeks that was marred by drugs and violence. (Dkt. 43-5, pp. 37-50.) In 1992, after a particularly violent argument, Plaintiff shot and killed Rodney. (Dkt. 43-8, pp. 5-27; Dkt. 43-9, p. 2.) Plaintiff refused a plea deal and was tried for second-degree murder, but found guilty by jury of voluntary manslaughter and sentenced to one to fifteen years' imprisonment. (Dkt. 43-8, pp. 5-27.) Plaintiff claims that she was not initially able to remember the incident, but suffered a mental breakdown in prison when her memories finally returned, resulting in her temporary placement in the prison psychiatric unit. (Dkt. 43-9, pp. 2-3.) Plaintiff was released in 1995, but she failed several drug tests and had to complete a thirty-day drug rehabilitation program to avoid returning to prison. (*Id.* at 14-15, 23-27.) After completing the

program, Plaintiff founded a Christian ministry called Jesus Freedom that includes a radio and television program. (Dkt. 43-9, pp. 29-33; Dkt. 43-10, p. 28.)

In 1996, Plaintiff learned about prisoner Felix Walls from Eddie's oldest son, who believed that Plaintiff's ministry could help Walls. (Dkt. 43-10, p. 27.) Plaintiff visited Walls at the Wayne County jail and soon fell in love with him. (*Id.* at 28.) Plaintiff believes that Walls' conviction is the result of a conspiracy against him and supported him throughout his retrial, even petitioning a federal judge and then United States Attorney General Janet Reno for assistance. (*Id.* at 29-44.) Walls was convicted a second time, however, which led Plaintiff to believe that God introduced her to Walls to inspire her to expose police corruption rather than to fulfill her own personal desires. (*Id.*) As a result of this revelation, Plaintiff had a series of altercations with the police. (Dkt. 43-11, pp. 6-8, 12-15, 46-47.)

In 2005, Plaintiff returned to prison for violating probation and marijuana possession when the police found a large quantity of the drug in her home. (Dkt. 43-12, pp. 39-46.) While serving this second prison sentence, Plaintiff began writing *The Hidden Hand*. (*Id.* at 44-45.) Plaintiff was released in 2007 (*Id.* at 47), but she had a health scare in 2009 that prompted her to write the final chapter. (Dkt. 43-13, pp. 1-4.) The final chapter details how Plaintiff began working as a community liaison for a home health care provider after serving her prison time. (*Id.* at 17-18.) She then founded her own home health care company that brings doctors to the residences of homebound individuals. (*Id.* at 18.) Plaintiff writes that she found redemption in ensuring that seniors and the disabled receive quality health care

and are treated with dignity. (*Id.* at 18-20.) The memoir ends after Plaintiff succeeds in restoring the utilities of one of her elderly clients who could not afford to pay those bills. (*Id.* at 31.) Plaintiff concludes by imploring her readers to trust in the power and presence of God's hidden hand in their own lives. (*Id.* at 32.)

## B. Plaintiff's Meeting with Rita Grant Miller

According to the First Amended Complaint, in 2011, approximately two years after completing *The Hidden Hand*, Plaintiff was introduced to Rita Grant Miller through a mutual acquaintance, producer Richard "Rick" Appling.[1] (Dkt. 43, ¶¶ 36-40.) Miller has worked as a screenwriter and has been involved in the production of several films. (*Id.* at ¶ 37.) Appling arranged for Plaintiff to visit Miller's residence in California for a meeting where Plaintiff and Miller discussed adapting *The Hidden Hand* into a screenplay.[2] (*Id.* at ¶ 40.) At the meeting, Plaintiff gave Miller a copy of *The Hidden Hand* and was interviewed at length by Miller, who took notes. (*Id.* at ¶¶ 42-43.) Miller told Plaintiff and Appling that Miller would adapt *The Hidden Hand* into a screenplay and pitch the idea to Defendant Lee Daniels. (*Id.* at ¶¶ 44-45.) Miller showed Plaintiff the 2013 movie *The Butler*, directed by Defendant Daniels and written and produced by Defendant Daniel Strong, to familiarize Plaintiff with Defendant Daniels' work. (*Id.* at ¶ 46.)

[1] No party has filed a deposition, declaration, or affidavit from Rita Grant Miller and, as they clarified at the motion hearing, Defendants do not challenge Plaintiff's version of her interactions with Miller or of Miller's interactions with them. At this stage, the Court will therefore accept Plaintiff's well-plead allegations with respect to Miller and the Individual Defendants as true.

[2] Plaintiff references her desire to make a movie about her life several times in *The Hidden Hand*. (*See, e.g.,* dkt. 43-1, pp. 12-13; dkt. 43-10, p. 8.)

Plaintiff alleges that, on information and belief, Miller wrote a script or a treatment of *The Hidden Hand*. (*Id.* at ¶ 47.) After Plaintiff returned to Michigan, Miller called Plaintiff from New Jersey and told Plaintiff that Miller was meeting with Defendant Daniels and would pitch the adaptation of *The Hidden Hand* to him. (*Id.* at ¶¶ 48-52.) Plaintiff asserts that, as part of this pitch meeting, Miller gave Defendant Daniels a copy of *The Hidden Hand*, Miller's adaptation or treatment of *The Hidden Hand*, and Miller's interview notes. (*Id.* at ¶¶ 53-55.) Defendant Daniels, according to Plaintiff, then shared these materials with Defendants Malcolm Spellman and Strong, among others. (*Id.* at ¶ 56.) After meeting with Defendant Daniels, Miller avoided all further contact with Plaintiff. (*Id.* at ¶ 57.)

## C. The FOX Television Series *Empire*

Defendants include the creators, writers, producers, directors, broadcasters, and distributors of the FOX network television series *Empire*, which debuted on January 7, 2015 and has been renewed for a third season. The series is set in present-day New York City and chronicles the saga of the Lyon family's struggle for control of their music and entertainment company, Empire Entertainment.[3] The family patriarch is rapper and music mogul Lucious Lyon, a former drug dealer who learns he has been diagnosed with a fatal disease. With only three years to live,

---

[3] The following two-paragraph summary of *Empire* is taken from DVD recordings of the first season submitted by Defendants as an exhibit to their Rule 12(b)(6) motion. (Dkt. 43, Ex. A.) Because Plaintiff repeatedly references the television series in her First Amended Complaint, the Court will consider those recordings as if they are incorporated by reference. *See Weiner v. Klais and Co.*, 108 F.3d 86, 89 (6th Cir. 1997). Whenever possible, the Court will try to avoid spoiling significant plot developments.

Lucious contemplates the fate of his empire, and begins to consider which of his family members is most qualified to succeed him.

When the series opens, Lucious is in full control of Empire Entertainment, a privately-held music and entertainment company that was founded by Lucious and his ex-wife, Cookie Lyon, with the help of money Cookie earned from her drug dealing operations. In the first episode, Cookie is about halfway through serving a thirty-year prison sentence, which she received after taking the fall for a drug deal gone wrong. Unexpectedly, Cookie gains release after seventeen years and confronts Lucious, demanding her share of the company. Thus begins the struggle for control of Empire Entertainment between Lucious, Cookie, and their three sons: Andre, a married businessman with bipolar disorder, Jamal, a gay singer rejected by his homophobic father, and Hakeem, a talented but unfocused rapper. Defendants compare the shifting alliances within and without the Lyon family to those in William Shakespeare's play *King Lear* or to those typically depicted in prime-time television soap operas about the rich and famous, such as *Dallas* and *Dynasty*. (Dkt. 46, pp. 16-17.)

### D. Substantial Similarities

Plaintiff alleges that that are many "striking and shocking similarities" between the way she depicted herself in *The Hidden Hand* and the character of Cookie Lyon. (Dkt. 43, ¶ 67.) In her First Amended Complaint, Plaintiff gives a list of twenty-three such similarities.  These include the fact that Plaintiff and Cookie Lyon are both light-skinned African-American women who wear expensive clothing,

lead gangs, have placed hits on men and sold drugs, have gay family members, have two family members who were murdered, have served prison sentences, and are known for their "vicious insults" and propensity to slap people. (*Id.*) Moreover, both Plaintiff and Cookie Lyon have shielded others by stepping in front of a loaded gun, have endured the kidnapping or attempted kidnapping of one of their children, lost their lovers while in prison, and attacked their former lovers' new lovers upon release from prison. (*Id.*) The complaint further notes that they both have a tendency to use the words "hoe" and "bitch". (*Id.*)

Defendants argue that these similarities are coincidental rather than substantial, and represent "unprotectable biographical facts, ideas, stock themes, and elements commonplace in drug and violence stories." (Dkt. 46, p. 11.) Plaintiff maintains that these similarities speak to the "expression and portrayal of a character" and are not mere biographical facts. (Dkt. 52, pp. 14-15.)

## II.    ANALYSIS

The motions before the Court raise three matters to resolve. First are Defendants' evidentiary objections to the declarations that Plaintiff has attached to her two response briefs. (Dkt. 56.) Second, there is Defendants' motion to dismiss Plaintiff's First Amended Complaint pursuant to Rule 12(b)(6). (Dkt. 46.) And third, the Individual Defendants have filed a motion to dismiss Plaintiff's First Amended Complaint pursuant to Rule 12(b)(2). (Dkt. 48.) The Court will now address each issue in turn.

9

## A. Defendants' Evidentiary Objections

As a threshold matter, Defendants have filed evidentiary objections to the declarations that Plaintiff submitted in support of her response briefs as containing hearsay or improper expert testimony. (Dkt. 56.) In particular, Defendants object to the declaration of Plaintiff's attorney, Thomas Heed, filed in support of Plaintiff's response to the Individual Defendants' Rule 12(b)(2) motion. (*Id.* at 1.) Defendants argue that Heed's declaration "improperly relies on hearsay references" to the contents of a contract between Defendant Daniels and FOX. (*Id.* at 8.) The Court finds that the record is insufficient to permit a determination on the question of personal jurisdiction. Consequently, the parties will be allowed to conduct thirty days of jurisdictional discovery, and the motion to dismiss will be denied without prejudice at this time. It is therefore premature to rule on the objection to Heed's declaration, which will also be overruled without prejudice.

The Court will also deny without prejudice Defendants' objections to the declarations of Plaintiff, Appling, and Paula Taylor that Plaintiff attached as exhibits in support of her response to Defendants' Rule 12(b)(6) motion. Defendants argue that Plaintiff's declaration relies on inadmissible hearsay by referencing, and mischaracterizing, statements made by a judge during a television news program that Plaintiff appeared on after she filed this case. (*Id.* at 9.) As for the declarations of Appling and Taylor, Defendants argue that they contain inadmissible expert testimony because the declarants "opine on the ultimate legal issue" of this case without having been qualified as experts. (*Id.* at 10-14.)

10

As noted below, when deciding a motion to dismiss, the Court's inquiry is limited to an examination of the complaint. *Weiner v. Klais and Co.*, 108 F.3d 86, 88 (6th Cir. 1997). The Court is not to consider matters outside the pleadings, and may only consider those documents attached to a motion to dismiss, such as a video recording of the *Empire* television show, that are referred to in the complaint and are central to Plaintiff's claims. [4] *Id.* at 89. To do otherwise would be to risk converting the motion to dismiss into a motion for summary judgment prior to any discovery. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.")

With the narrow scope of its inquiry in mind, the Court will not rely on the declarations attached to Plaintiff's response briefs. Accordingly, any objections thereto will be denied without prejudice. If Plaintiff attempts to rely on these declarations at the summary judgment phase, then Defendants may renew their objections at that time.

---

[4] In her response brief filed in opposition to Defendants' Rule 12(b)(6) motion, Plaintiff requests that the Court exclude Defendants' exhibit video recording of the first season of *Empire* attached to its Rule 12(b)(6) motion. (Dkt. 52, p. 16.) In the alternative, Plaintiff requests that the declarations she has filed be considered and Defendants' Rule 12(b)(6) motion converted to a motion for summary judgment. (*Id.*) The Court has broad discretion to decide whether to consider matters outside the pleadings and convert the motion. *See Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010) (applying an abuse of discretion standard to district court's decision to convert a 12(b)(6) motion to dismiss into a motion for summary judgment). The Court will decline to exercise its discretion here because no discovery has been conducted in this case and questions remain with respect to its jurisdiction over the Individual Defendants, but the Court will consider the video recording of *Empire* because it is clearly central to Plaintiff's claims and referenced throughout her First Amended Complaint. Indeed, determining whether Plaintiff's claims are plausible requires comparing the two works. The declarations in question, by contrast, are not necessary to decide Defendants' Rule 12(b)(6) motion.

11

## B. Defendants' Rule 12(b)(6) Motion

Defendants challenge Plaintiff's First Amended Complaint as insufficient to state a claim and argue that it must be dismissed pursuant to Rule 12(b)(6). (Dkt. 46.) Both in their motion and at the hearing, Defendants did not contest Plaintiff's allegations that the Defendants had access to *The Hidden Hand*.  Instead, Defendants focus exclusively on Plaintiff's allegations of substantial similarity. (*Id.* at 19-32.) Defendants also argue that Plaintiff's state law claim must be dismissed because Plaintiff has not plead any facts alleging that she has a pecuniary interest or commercial value in her identity. (*Id.* at 32-34.) Plaintiff disputes these arguments. (Dkt. 52.)

### 1.  Legal Standard for a Rule 12(b)(6) Motion

A motion to dismiss only tests the sufficiency of a complaint. In a light most favorable to the plaintiff, the Court must assume that the factual allegations are true and determine whether the complaint states a valid claim for relief. *See Albright v. Oliver*, 510 U.S. 266 (1994); *Bower v. Fed. Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996). To survive a Rule 12(b)(6) motion to dismiss, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and emphasis omitted); *see also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007). "[T]hat a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.

Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 679 (internal quotation marks and citation omitted). Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* (internal quotation marks and citation omitted). In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* at 678 (internal quotation marks and citation omitted).

When ruling on a motion to dismiss, a court may not consider matters outside the pleadings. *Weiner*, 108 F.3d 86, 88 (6th Cir. 1997). However, "a court may consider any matters of which a court may take judicial notice without converting a party's motion to dismiss into a motion for summary judgment." *Id.* Additionally, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Id.* at 89.

### 2.  Plaintiff's Copyright Infringement Claim

Count I of Plaintiff's First Amended Complaint alleges a copyright infringement claim against Defendants under 17 U.S.C. § 101 *et seq.* (Dkt. 43, ¶¶ 75-86.) Plaintiff asserts that Defendants have willfully violated Plaintiff's copyright by "writing, producing, and broadcasting" *Empire*, the infringement has occurred in Michigan because the show is broadcast and sold there, and Defendants have made, and will continue to make, unjust and substantial monetary gains. (*Id.*)

Because "copyright infringement lends itself readily to abusive litigation, since the high cost of trying such a case can force a defendant who might otherwise be successful in trial to settle in order to avoid the time and expenditure of a resource intensive case … greater particularity in pleading, through showing 'plausible grounds', is required." *Nat'l Bus. Dev. Servs., Inc. v. Am. Credit Educ. & Consulting Inc.*, 299 F. App'x 509, 512 (6th Cir. 2008). Showing plausible grounds means pleading "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [copyright infringement]." *Id.* (internal citation omitted).

"The elements of a copyright-infringement claim are (1) ownership of the copyright by the plaintiff and (2) copying by the defendant." *Zomba Enterprises, Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 581 (6th Cir. 2007). The first element is satisfied in this case, as Defendants do not dispute Plaintiff's allegation that she holds the copyright to *The Hidden Hand*. The essential question is thus whether Defendants unlawfully copied any elements of Plaintiff's memoir.

To establish that *The Hidden Hand* has been copied, Plaintiff must either introduce direct evidence of Defendants' copying or prove it indirectly by showing that Defendants had access to Plaintiff's work *and* that there is a substantial similarity between it and *Empire*, and in particular between Plaintiff as she depicts herself in the memoir and the character of Cookie Lyon, thus giving rise to an inference of copying. *See Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999).

For purposes of their Rule 12(b)(6) motion, Defendants do not contest Plaintiff's allegations that Defendants had access to *The Hidden Hand* through Rita Grant Miller. (Dkt. 46, p. 9 n.6; Dkt. 54, p. 3.) The dispute at this stage is therefore about whether substantial similarities exist between these works.

Although access is not in dispute, the Sixth Circuit has indicated that proof of access can affect the degree of proof of similarity required to show copyright infringement and vice versa:

> [I]n some cases[,] the relationship between the degree of proof required for similarity and access may be inversely proportional: where the similarity between the two works is strong, less compelling proof of access may suffice. [Citing *Ellis v. Diffie*, 177 F.3d 503, 507 (6th Cir. 2004).] *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) (stating that under the "inverse ratio rule," a lower standard of proof of similarity is required where a high degree of access is shown); *Arnstein v. Porter*, 154 F.2d 464, 469 (2d Cir. 1946) (stating that "a case could occur in which the similarities were so striking that we would reverse a finding of no access, despite weak evidence of access (or no evidence thereof other than the similarities).")

*Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir. 2004) (emphasis added); *see also Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996) ("[W]e require a lower standard of proof on substantial similarity when a high degree of access is shown.").

### a.  Determining Substantial Similarity

When determining whether two works are substantially similar, the Court engages in a two-step analysis. First, "the court must 'filter' out elements of the work that are not original to the author." *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir. 2009) (quoting *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 318 (6th Cir. 2004)). Copyright protection is limited to the "expression of ideas" in a work – those aspects "that display the stamp of the author's originality" – and does not extend to ideas themselves. *Stromback*, 384 F.3d at 296 (internal citations omitted).

To be original, "the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Murray Hill*, 361 F.3d at 318 (quoting *Feist v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991)). While facts themselves are not protectable, "it is beyond dispute that compilations of facts are within the subject matter of copyright" even though "copyright in a factual compilation is thin." *Feist*, 499 U.S. 340, 345, 349. To the extent that a "compilation author clothes facts with an original collocation of words, he or she may be able to claim a copyright in this written expression." *Id.* In short, an author's selection and arrangement of facts, as well as her observations, if original, are protectable. *See id.* at 348.

Scènes à faire, or "scenes of action," "the indispensable or standard aspects of a work, or those that 'follow directly from unprotectable ideas' should be filtered out

as well." *Bridgeport Music*, 585 F.3d at 274 (footnote omitted) (quoting *Murray Hill*, 361 F.3d at 320). "[N]atural elements in a story about a college fraternity," for example, include "parties, alcohol, co-eds, and wild behavior." *Stromback*, 384 F.3d at 298. "Elements such as drunks, prostitutes, vermin and derelict cars" would similarly not be afforded copyright protection "in any realistic work about […] policemen in the South Bronx." *Id.* (quoting *Walker v. Time Life Films*, 784 F.2d 44, 50 (2nd Cir. 1986).

After filtering out the unprotectable elements, the works in question must be compared for substantial similarity. "Substantial similarity exists where the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable [sic] expression by taking material of substance and value." *Stromback*, 384 F.3d at 297 (internal quotation omitted). "[T]he copying of a relatively small but qualitatively important or crucial element can be an appropriate basis upon which to find substantial similarity." *Bridgestone*, 585 F.3d at 275; *see also Stromback*, 384 F.3d at 297 ("The misappropriation of even a small portion of a copyrighted work may constitute an infringement under certain circumstances. Even if a copied portion [is] relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity."). "[R]andom similarities scattered throughout the works are not a proper basis for a finding of substantial similarity." *Stromback*, 384 F.3d at 297 (internal quotation omitted).

As Defendants have filed a Rule 12(b)(6) motion, the Court's role at this stage is necessarily limited to deciding whether Plaintiff has plausibly established that copyrightable elements of her self-portrayal in *The Hidden Hand* are "substantially similar" enough to copyrightable elements of the character Cookie Lyon so as to raise an inference of copying.[5] *See Bowen v. Paisley*, No. 3:13-0414, 2013 WL 6237469, at *6 (M.D. Tenn. Dec. 3, 2013).

### b. Substantial Similarity between Plaintiff and Cookie Lyon

Here, the dispute is over whether two characters are substantially similar. Plaintiff alleges that the character of Sophia Eggleston in *The Hidden Hand* was copied and used as the basis for the character of Cookie Lyon on *Empire* in violation of Plaintiff's copyright.

---

[5] The Sixth Circuit has cautioned that granting summary judgment motions in copyright infringement cases is generally disfavored because the issue of "substantial similarity" can present a close factual question:

> In copyright infringement cases, "summary judgment, particularly in favor of a defendant, is a practice to be used sparingly" because substantial similarity is often an extremely close question of fact, but "a court may compare the two works and render a judgment for the defendant on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity."

*Jones v. Blige*, 558 F.3d 485, 490 (6th Cir. 2009) (quoting *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003)). Summary judgment motions, unlike Rule 12(b)(6) motions, are premised on a developed record—often with the benefit of expert testimony. If summary judgment motions in these kinds of cases are to be granted "sparingly," it is not surprising that this Court identified only a handful of cases within this circuit in which a district court granted a Rule 12 motion involving a copyright claim after conducting a substantial similarity analysis. *See, e.g.*, *Ford Motor Company v. Autel US Inc.*, 2015 WL 5729067, at *5 (E.D. Mich., 2015) (Rule 12 motion granted without prejudice, plaintiff granted leave to amend complaint); *Dorchen/Martin Associates, Inc. v. Brook of Cheboygan, Inc.*, 838 F.Supp.2d 607, 613 (E.D. Mich., 2012) (same); *Pollick v. Kimberly Clark–Corp.*, 817 F.Supp.2d 1005 (E.D. Mich., 2011) (Rule 12 motion granted in favor of the defendant manufacturer of Huggies "jeans diapers" against the plaintiff holder of a copyright for "diaper jeans."); *National Business Development Services, Inc. v. American Credit Educ. & Consulting, Inc.*, 2007 WL 2318752, at *3 (E.D. Mich., 2007) (Motion to dismiss granted because Plaintiff's complaint contained a blanket assertion of entitlement to relief, but no factual allegations supporting that assertion.").

In *National Business Development Services, Inc. v. American Credit Education and Consulting, Inc.*, 299 Fed. App'x. 509 (6th Cir. 2008), the Sixth Circuit upheld the dismissal of the plaintiff's complaint because it contained a "blanket assertion of entitlement to relief" without "any factual allegations supporting that assertion." 299 Fed. App'x. at 512. There was neither an identification of a work produced by the defendants that infringed upon the plaintiff's copyrighted work, nor a description of the manner in which the defendants' works infringed upon the plaintiff's work. *Id.* The Sixth Circuit agreed with the district court that the plaintiff's complaint amounted to no more than a speculative claim that the defendants may have produced some work that in some way infringed upon the plaintiff's works and therefore was an insufficient pleading. *Id.*

In her First Amended Complaint, Plaintiff lists twenty-three elements of her character in *The Hidden Hand* that she alleges have been copied by Defendants and used to create the character of Cookie Lyon on *Empire*. (Dkt. 43, ¶ 67.) Defendants argue that these elements are insufficient to establish substantial similarity between Plaintiff and Cookie Lyon because these elements are unprotectable "bare facts" from Plaintiff's life story.[6] (Dkt. 46, p. 22.) Plaintiff responds that what Defendants characterize as "bare facts" are "expressive characteristics" that define a character and represent a protectable compilation of experiences and traits. (Dkt

---

[6] Defendants also argue that the plot, storyline, setting, pace, themes, and sequence of events are dissimilar between the two works. (Dkt. 46, pp. 22-32.) Because Plaintiff's First Amended Complaint only contains the alleged similarities between Plaintiff as she depicted herself in her memoir and Cookie Lyon, the Court will focus its analysis on the similarities between these two characters only.

52, pp. 22-23.) In short, Defendants assert that these twenty-three elements are distinct events, traits, or experiences that are unoriginal and unprotectable while Plaintiff argues that a character is more than the sum of its parts.

At first glance, many of the elements Plaintiff alleges were copied by Defendants seem like elements typical to stories about those involved in drugs and violence. It would not be atypical, for example, for the boss-type character of such a story to have sold drugs, to be a gang leader, to own firearms, to wear expensive clothing, to have an assertive or abrasive personality, to have been incarcerated, to have ordered a hit on someone else, or to have experienced the murder of a friend or family member. In this case, however, Plaintiff's memoir features a woman in the dominant role as drug dealer, gang leader, and perpetrator of violence. This is not the stock and trade of the average drug gangster potboiler. More commonly, the gang leader, drug dealer, or boss-like figure is a man; here however, both Plaintiff and Cookie Lyon are light-skinned, African-American women.[7]

Some of the other alleged elements found in common between Eggleston and Cookie Lyon are also not obviously of the stock-standard variety, regardless of a character's gender. For example, Plaintiff alleges that an element in common between herself and Cookie Lyon is that both have a gay family member. Plaintiff's brother is gay, as is Cookie's son, Jamal. Other unusual commonalities are that both Plaintiff and Cookie have experienced the kidnapping of one of their children,

---

[7] At the motion hearing, Defense counsel could not offer examples of other works in this narrative genre that featured female characters in the "drug or organized crime boss-like" role. Other than the 2011 telenovela series *La reina del Sur* produced by Telemundo or the 1999 Jorge Franco novel *Rosario Tijeras*, neither can this Court.

have had two close family members murdered, have lost their lovers while serving time in jail, and have shielded others by stepping between them and a loaded gun. Taken together, these elements are arguably original and substantially similar.

In addition to alleging that substantial similarities exist between herself and Cookie Lyon, Plaintiff also presents strong and, for purposes of this motion, unchallenged, allegations that Defendants had access to her work through Rita Grant Miller. Plaintiff alleges that she met with Miller, that they discussed adapting *The Hidden Hand*, that a treatment was drafted, and that Defendants had access to her work, the treatment, and Rita Grant Miller's interview notes when Miller met with Defendant Daniels to pitch the adaptation of *The Hidden Hand*.

As this is a Rule 12(b)(6) motion, the Court is not reaching the merits of Plaintiff's claim but is strictly limiting its inquiry to the sufficiency of the First Amended Complaint. Based on the record at this stage of litigation, Plaintiff has satisfied the "greater particularity in pleading" requirement for copyright actions. Plaintiff alleges that there are twenty-three elements in common between Sophia Eggleston as depicted in *The Hidden Hand* and Cookie Lyon as portrayed on *Empire*. While Defendants argue that the two works in question have little-to-nothing in common with respect to setting, pace, narrative structure, or other characters, Plaintiff is not alleging otherwise. Plaintiff has thus sufficiently identified a work product that allegedly infringed on her copyrighted work and has described the manner in which Defendants' work infringed upon Plaintiff's product with adequate specificity to give Defendants notice of the claim against them.

Accordingly, Plaintiff's allegation that there are substantial similarities between these two works with respect to the characterization of Sophia Eggleston as depicted in the *Hidden Hand* and the fictional character Cookie Lyon as depicted on *Empire* is plead with sufficient facts to make it reasonable to expect that discovery may reveal evidence of copyright infringement and is therefore sufficiently plausible to survive a motion to dismiss.

### 3.  Plaintiff's State Law Right of Publicity Claim

Count II, however, is another story. Count II of Plaintiff's First Amended Complaint alleges, under Michigan common law, that Defendants appropriated her right to publicity. (Dkt. 43, ¶¶ 87-96.) In particular, Plaintiff alleges that the portrayal of Cookie Lyon "uses the Plaintiff's likeness, actions, attributes, speech, habits, and other identifiable characteristics" and that, as a result, Plaintiff "has suffered, and continues to suffer, economic damages." (*Id.* at ¶¶ 89, 96.)

Plaintiff has not plead sufficient facts to state a claim for the appropriation of her right to publicity in violation of Michigan common law and this claim will therefore be dismissed. The right of publicity protects the identity of a celebrity from exploitive commercial use. *Parks v. LaFace Records*, 329 F.3d 437, 459 (6th Cir. 2003). This right is governed by state law, and Michigan has recognized such a right. *See Pallas v. Crowley, Milner & Co.*, 322 Mich. 411, 417 (1948). "A right of publicity claim is similar to a false advertising claim in that it grants a celebrity the right to protect an economic interest in his or her name." *Parks*, 329 F.3d at 460. All that a plaintiff must prove in a right of publicity action is (1) that she has a

pecuniary interest in her identity, and (2) that her identity has been commercially exploited by a defendant. *Id.*

Here, Plaintiff has not alleged any facts in the second version of her complaint establishing that she has a pecuniary interest or any commercial value in her identity. At the motion hearing, Plaintiff's counsel argued that Plaintiff's efforts to establish a pecuniary interest in her identity are sufficient to establish a protected right of publicity in that identity. While Plaintiff "need not be a national celebrity to prevail," Plaintiff "must demonstrate that there is value in associating an item of commerce with [her] identity" in that "a merchant would gain significant commercial value by associating an article of commerce with [her]." *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 624 (6th Cir. 2000). Plaintiff has made no such allegation, and the Court is satisfied that allowing Plaintiff to amend her complaint a second time would not cure this defect. Count II of the First Amended Complaint will therefore be dismissed.

## C. Defendant Daniels, Strong, and Spellman's Rule 12(b)(2) Motion

The Individual Defendants have filed a motion to dismiss Plaintiff's First Amended Complaint pursuant to Rule 12(b)(2), arguing that Plaintiff has failed to establish this Court's jurisdiction over them. (Dkt. 48.) In particular, the Individual Defendants assert that they lack minimum contacts with Michigan and the Eastern District of Michigan and they cannot be fairly hailed into court in this state. (*Id.* at 1.) Plaintiff asserts in her response to the Individual Defendants' motion that sufficient minimum contacts exist because *Empire* is broadcast in Michigan, video

23

recordings of the show are sold in Michigan, and that several entertainment industry publications have reported that Defendant Daniels signed a contract with FOX to distribute the show nationally. (Dkt. 51, pp. 10-11.) As discovery has not yet taken place in this case, no such contract has been produced.

### 1. Legal Standard

If a district court lacks jurisdiction over the defendants, dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(2). "The burden of establishing jurisdiction is on the plaintiff." *Tobin v. Astra Pharm. Prod., Inc.*, 993 F.2d 528, 543 (6th Cir. 1993). "A district court, in its discretion 'may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions.'" *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 449 (6th Cir. 2012) (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)).

A federal court's exercise of jurisdiction over litigants must be both "(1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 888 (6th Cir. 2002). For Michigan, the courts have determined Michigan's long-arm statute gives the "maximum scope of personal jurisdiction permitted by the due process clause of the Fourteenth Amendment." *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1236 (6th Cir. 1981). Due process is satisfied if a defendant has "sufficient minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fairplay

and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). "But the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)).

Personal jurisdiction issues in Michigan courts are governed by the state's long-arm statute, Mich. Comp. Laws §§ 600.715 (corporations) and 600.705 (individuals). Further, Michigan courts and courts within this Circuit have consistently held that Michigan's long-arm statute extends as far as the Fourteenth Amendment's Due Process Clause allows. *See Neogen Corp.*, 282 F.3d at 888; *see also Viches v. MLT, Inc.*, 127 F. Supp. 2d 828, 830 (E.D. Mich. 2000)). Accordingly, if jurisdiction over the Individual Defendants in this Court is proper under the Fourteenth Amendment, it is also proper under Michigan's long-arm statute.

Due process is satisfied if the defendants have "sufficient minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). In order to find limited personal jurisdiction, a plaintiff needs to demonstrate three key factors: (1) the defendant must "purposefully avail himself of the privilege of acting in the forum state;" (2) "the cause of action must arise from the defendant's activities there;" and (3) "the acts of the defendant...must have a substantial enough connection with the forum state to

make the exercise of jurisdiction over the defendant reasonable." *Southern Mach.*
*Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). All three factors must
be present to allow for a finding of limited personal jurisdiction.

### 2.   Jurisdictional Discovery Warranted

Plaintiff argues in her response brief that the Individual Defendants have
entered into a nationwide distribution contract and the product in question has
been distributed nationwide, therefore personal jurisdiction has been established in
any forum where the product in question is sold. (Dkt. 51, p. 18.) In sum, Plaintiff
asserts that there is personal jurisdiction in this case because the Individual
Defendants themselves, through a distributor, have broadcast and sold *Empire* in
Michigan. They have not only introduced *Empire* into the stream of commerce, but
have also directed it toward Michigan. The Individual Defendants maintain that
Plaintiff's argument consists of factual misrepresentations supported by
inadmissible hearsay. (Dkt. 55, pp. 2-4.)

As this Circuit has explained, "the stumbling block for a plaintiff alleging
jurisdiction on the basis of a product's availability in the forum state has ordinarily
been that 'minimum contacts' includes not just the placement of the product in the
stream of commerce, but '[a]dditional conduct of the defendant [that] may indicate
an intent or purpose to serve the market in the forum State....'" *Palnik v. Westlake
Entertainment, Inc.*, 344 Fed. App'x. 249, 252 (2009) (quoting *Asahi Metal
Industry Co., Ltd. v. Superior Court*, 480 U.S. 102, 112 (1987) (O'Connor, J.,
plurality opinion)). Accordingly, the Sixth Circuit has focused on the distribution

26

relationship in determining whether a producer has sufficient connection to a forum state for jurisdiction to be consistent with the due process clause. *Id.*

For example, in *Bridgeport Music, Inc. v. Still N the Water Publishing*, 327 F.3d 472 (6th Cir. 2003), the Sixth Circuit found that where a defendant was "merely aware" of the fact of nationwide distribution without control over said distribution, dismissal was appropriate. 327 F.3d at 480. By contrast, where a defendant sought nationwide distribution by contracting with a distributor for nationwide sales, the Sixth Circuit has found that a prima facie finding of jurisdiction exists. *Id.* at 483; *see also Tobin v. Astra Pharm. Prods.*, Inc., 993 F.2d 528, 543 (6th Cir. 1993) (personal jurisdiction appropriate because the defendant "made a deliberate decision to market [its product] in all 50 states ...."); *Poyner v. Erma Werke Gmbh*, 618 F.2d 1186, 1190–91 (6th Cir. 1980).

Plaintiff alleges in her First Amended Complaint that (1) the Individual Defendants "helped write, create, develop, produce, or otherwise make" *Empire*; and (2) Defendants Daniels and Strong direct *Empire*. (Dkt. 43, ¶¶ 29, 61.) Defendants collectively produced and earned money from the creation and distribution of *Empire*, which has been broadcast and distributed in Michigan. (*See id.* at ¶¶ 23, 73, 82, 88.) Drawing inferences in Plaintiff's favor, as the Court must at this stage of the litigation, the allegations in the complaint suggest that either the Individual Defendants, after making *Empire*, caused it to be distributed in Michigan through a national or regional distribution contract, or they were not necessarily responsible

for *Empire* appearing in Michigan, perhaps because they do not own the distribution rights, or deferred to a third-party distributor.

The first scenario may permit personal jurisdiction, while the second scenario may not. *See Palnik v. Westlake Entertainment, Inc.*, 344 Fed. App'x. 249, 252 (2009). Because no discovery has yet been conducted in this case, it is unknown which scenario is more accurate. Consequently, the parties will be ordered to conduct thirty days of jurisdictional discovery. The Individual Defendants' Rule 12(b)(2) motion will therefore be denied without prejudice, but may be renewed once this jurisdictional discovery is complete.

### III.   CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Defendants' motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted (Dkt. 46) is **GRANTED IN PART** with respect to Count II of Plaintiff's First Amended Complaint and **DENIED IN PART** with respect to Count I. Accordingly, Count II of Plaintiff's First Amended Complaint is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that the parties will conduct limited jurisdictional discovery for no more than **THIRTY DAYS** from the date of this Opinion and Order. Such discovery must be limited to jurisdictional issues raised in or relevant to Defendant's motion to dismiss for lack of personal jurisdiction. Any party that believes the opposing party's discovery requests exceed the scope and

purpose of limited jurisdictional discovery is instructed to contact the Court to arrange a telephone status conference.

Because the parties will conduct jurisdictional discovery, **IT IS FURTHER ORDERED** that Defendant Lee Daniels, Malcolm Spellman, and Daniel Strong's motion to dismiss Plaintiff's Complaint for lack of personal jurisdiction (Dkt. 48) is **DENIED WITHOUT PREJUDICE**. These defendants may re-file this motion after jurisdictional discovery is complete.

Defendants' evidentiary objections (Dkt. 56) are **DENIED WITHOUT PREJUDICE** and may be renewed at the summary judgment phase.

**SO ORDERED.**

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  August 16, 2016

**Certificate of Service**

I hereby certify that this Order was electronically submitted on August 16, 2016, using the CM/ECF system, which will send notification to each party.

By:  s/A. Chubb
Case Manager

29